Brenda L. HOPKINS et al., Appellants,

v.

Robert AKINS, Sr., Appellee.

No. 91–CV–1241.

District of Columbia Court of Appeals.

Argued March 31, 1993.

Decided May 10, 1993.

Brenda L. Hopkins, for appellants.

Q. Russell Hatchl, for appellee.

Before SCHWELB, FARRELL and KING, Associate Judges.

FARRELL, Associate Judge:

Appellant Brenda L. Hopkins, attorney for the personal representative of the estate of Irene Akins, who died intestate, was found liable in a non-jury trial for breach of contract and legal malpractice to the decedent's surviving spouse, appellee Robert Akins, Sr., for the sum of appellee's intestate share of the estate.[1] We hold that (1) no contract existed between Hopkins and Akins, Sr., and (2) Hopkins owed no duty of reasonable care to Akins, Sr. arising from her attorney-client relationship with the personal representative. We therefore reverse and remand with directions to enter judgment for appellants.

I.

Irene Akins died intestate, survived by her husband and her son Robert Akins, Jr., who was appointed personal representative of her estate.[2] Under the District's intestacy statute, Akins, Jr. was entitled to receive two thirds of the mother's estate and Akins, Sr. one third (plus the family allowance). Mrs. Akins' home was the major asset of the estate and was eventually sold by the person-

---

1. Also found liable was Hopkins' law partner, Brett Murchison, but since Hopkins was the principal attorney for the personal representative, we employ only Hopkins' name in referring to the appellants.

2. Robert Akins, Jr. is the natural son of appellee, Robert Akins, Sr., and the adopted son of the deceased.

al representative, yielding net proceeds of $46,315.32. In October 1987, Akins, Jr. deposited the proceeds in the First American Bank in the name of "Estate of Irene Jackson Akins, by Robert Akins, Jr., personal representative." By December 1988, he had personally withdrawn all of the funds in the account, depriving his father of his intestate share.

Akins, Sr. brought suit against his son, against whom a default judgment was later entered, and the son's attorney, Brenda L. Hopkins, and Hopkins' law partner, Brett Murchison. Only Hopkins and Murchison have appealed. The complaint against them alleged breach of contract, breach of a surety agreement, "negligent failure to control estate assets," and "negligent failure to stop wrongful conversion." The latter two counts, as the parties agreed below, were "essentially [for] malpractice." At trial Akins, Sr. rested primarily on his previously filed "Statement Of Facts Not In Dispute," which the court admitted as an exhibit at trial without objection. Appellant Hopkins testified in her own behalf.

Hopkins had been retained by Akins, Jr. to initiate a probate proceeding in Superior Court upon his mother's death. Upon her petition, the son was named personal representative of the estate. At about this time, Akins, Sr. retained attorney Q. Russell Hatchl to represent him as an heir. On March 30, 1987, Hopkins wrote Hatchl a letter enclosing a document entitled "Consent and Waiver of Additional Bond" which requested Akins, Sr.'s consent to the sale of the decedent's home and waiver of an increased bond to cover the proceeds of the sale.[3] Hatchl informed Hopkins by telephone that consent and waiver of the bond would not be given unless Hopkins gave written assurance that she would insure proper disbursement of the proceeds. Hatchl "suggested" that Hopkins be a required signatory on any account containing the proceeds. Hopkins agreed to memorialize this arrangement, and did so in a letter to Hatchl of April 20, 1987, stating:

> This letter is written as a result of our telephone conversation of this date concerning the sale of real property owned by the [estate of Irene Akins]. You may be assured that all proceeds from the sale shall be under joint control. Any estate account established will require both my signature and that of the personal representative. Assuming this will satisfy your client, please forward the consent to the sale at your earliest convenience.

After receiving this letter, Akins, Sr. consented to the sale of the house for not less than $58,000[4] and waived the requirement of an additional bond.

When Hopkins and Akins, Jr. attempted to open a joint account at First American Bank, they were told that the bank did not permit that arrangement, so they opened an account there in the estate's name with the understanding that the funds would be placed in a joint account later. Hopkins testified that she retained the bank book and opening checkbook for the account, containing only a few checks, and initially prepared and forwarded checks bearing Akins, Jr.'s signature to cover expenses of administration. Hopkins also approved a series of checks for rent payable to the purchaser of the decedent's home, where Akins, Jr. had been forced to hold over as a tenant, and a check for a security deposit on a home the son intended to rent with an option to buy. Hopkins explained that "[b]ecause [her] client was not employed, had no source of employment, a wife and two children and was entitled to two-thirds of this estate, [she] had no prob-

---

3. D.C.Code § 20–502(a) (1989) provides that "[u]nless excused from giving bond by ... written waiver of all interested persons, each personal representative shall execute a bond to the District of Columbia for the benefit of interested persons...." D.C.Code § 20–742(b) allows the personal representative to sell real property of the estate pursuant to court order and upon certification that the bond has been expanded by an amount equal to the fair market value of the real estate as appraised.

4. The house was sold for $58,000 (yielding net proceeds of approximately $46,000) less a $2,500 "decorative allowance." In his suit Akins, Sr. claimed that this deduction was a breach of contract—"a thinly disguised reduction of the purchase price"—and included the $2,500 in his claim for damages.

lems with the advance distribution to him for those purposes." Thereafter, in January 1988, Hopkins discovered that Akins, Jr. was making withdrawals without her knowledge.

Eventually Hopkins became convinced that Akins, Jr. did not intend to move the proceeds to a joint account and, indeed, planned to withdraw more money from the account than he was entitled to under the statute. She contacted Nicholas Ward, a former Register of Wills, who advised her to have the account frozen or else to inform the Register of Wills so that Akins, Jr. could be removed as personal representative. As Hopkins was unable to have the account frozen without a court order, she informed the current Register of Wills, Constance Stark (Evans), of the situation in late August 1988. The trial judge found, however, that after this initial meeting with Stark, Hopkins took no further action in the matter. Before a show cause order could issue removing Akins, Jr. as personal representative, he withdrew the remaining funds from the account.[5]

In a memorandum opinion and order, the trial judge found Akins, Jr., Hopkins and her law partner jointly and severally liable for the amount Akins, Sr. would have received from the estate but for the diversion of assets. Akins, Jr.'s liability was based on his conversion of the money; the attorneys' liability was based on breach of contract and legal malpractice. The judge found that Hopkins had personally "agreed in writing ... to protect the Estate funds by placing them into a joint account with [herself] as

signatory. As consideration for Hopkins' promise, Robert Akins, Sr. relinquished his right to require the personal representative to post a bond to protect the estate assets." Akins, Sr., the judge found, was either the party with whom Hopkins contracted or, alternatively, a third party beneficiary of a contract between the two attorneys, Hopkins and Hatchl.

The judge further concluded that, aside from the contract, Hopkins, as attorney for the personal representative, owed a duty of reasonable care not only to him but also to the beneficiaries of the estate.[6] Because Hopkins "failed to take any action" to avert the misconduct by Akins, Jr., she had therefore "breached her professional and ethical duties to the Estate by permitting the continued depletion of Estate funds."

## II.

■ Considering first the issue of breach of contract, we cannot agree with the trial judge that Hopkins contracted with Akins, Sr. (or with the father's attorney) to be a joint signatory on the account containing the proceeds of the sale. The April 20, 1987 letter established that Hopkins acted as counsel to, and as an employee of, the personal representative in transmitting Akins, Jr.'s agreement to a joint account, nothing more.

■ In this appeal arising from a bench trial, we must decide independently whether

5. Hopkins testified that because she believed her ethical obligations ran to the personal representative, she did not apprise Akins, Sr., of the deteriorating situation. Rather, when she realized he could be harmed, she "took the steps that [she] thought would prevent him [from] being damaged." Although Akins, Sr.'s counsel had written her in December 1987, voicing suspicions that his son was depleting the estate, Hopkins did not answer these letters because, as she claimed in responding to interrogatories, the father had made previous misrepresentations regarding the son's adopted status, and she did not want to exhaust her client's resources supplying information she felt Akins, Sr. could obtain himself. The trial judge did not accept Hopkins' rather forgiving view of her own conduct.

6. The judge cited no cases for this proposition (the parties had supplied him with almost none

bearing on the issue), but found "compelling" a memorandum to the Legal Ethics Committee written in an unrelated matter by Jacob Stein, Esq., in which Mr. Stein drew an analogy between the attorney for the personal representative and the general counsel of a corporation who is given information by a director that the director has embezzled funds, and who ethically must make that information known to the officers and directors. While the memorandum discussed an attorney's ethical obligations in the face of evidence of fraud by the client, the author was careful to state: "The Committee was explicit that the question regarding whom the attorney represents [*i.e.*, the personal representative or the beneficiaries, or both] is a legal question, as to which the Committee expresses no opinion."

The trial judge further based Hopkins' duty to the beneficiaries on the fact that her fees were to be paid out of the estate's assets.

the trial judge committed "errors of law." D.C.Code § 17–305 (1989). Hopkins does not dispute that the April 20 letter, viewed together with the previous letter and telephone conversation, contained an offer to contract by Akins, Jr. which his father accepted by forwarding the waiver. The issue before us is whether the agreement purported to bind Hopkins herself. That is essentially a question of law, for in answering it we apply an "objective" test of "what a reasonable person in the position of the parties would have thought the disputed language meant." *Christacos v. Blackie's House of Beef, Inc.*, 583 A.2d 191, 194 (D.C.1990) (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 205 (D.C.1984)); *see also Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1093 (D.C.1988).

Preliminarily, Akins, Sr. does not contend that any contract was formed during the April 20 telephone conversation, in which Hatchl advised Hopkins that Akins, Sr. would not waive the bond requirement unless he "received a written assurance from [Hopkins] that she would ensure that funds derived from the sale of [the decedent's home would] not be disbursed improperly." Akins, Sr. made no promise to waive the bond requirement, declaring instead (through Hatchl) that he would not act until he received the written assurance. The subsequent writing thus became the offer to contract, specifying that the father could accept it by returning the consent and waiver form signed, which he did two days later. ·

The assurances in the April 20 letter were made by Hopkins in her capacity "as an employee of the personal representative," *Poe v. Noble*, 525 A.2d 190, 193 (D.C.1987) (under District of Columbia probate law, "counsel for the estate [is] viewed as an employee of the personal representative"), a fact Akins, Sr.—represented by counsel—is presumed to have known.[7] The situation, as we see it, is no different than if Hopkins' letter had said, "*My client has agreed* that all proceeds from the sale shall be under joint control," or, indeed, than had Akins, Jr. written a letter giving assurance that his attorney would be a joint signatory. Hopkins spoke only for her client, and gained nothing by making herself a party to the contract. Although a party need not bestow a benefit on another to give valid consideration for a contract—only a detriment is required[8]—it would be unreasonable to conclude that Hopkins intended to risk personal financial exposure (in the event of unauthorized withdrawals by the client) without seeking anything for herself in return.

Further, the law disfavors an interpretation that would oblige Hopkins to do something she had no independent power to do. Hopkins had no authority to *take* joint control of the estate assets or make herself a required signatory of the account holding the assets. Under D.C.Code § 20–702, it is the "personal representative [who] has a right to and shall take possession or control of the decedent's estate." Thus, only Akins, Jr. could lawfully authorize joint control of the bank account, and, as the agreement demonstrates, that is what he did. While appellee contends he would not have agreed to waive the bond without Hopkins' personal assurances, her inability to control the account without the son's consent reinforces the objective intent of the parties to bind the father and the son, not their attorneys. That same inability defeats any claim of promissory estoppel by Akins, Sr. because it would have been unreasonable for him to rely on a promise that Hopkins could only make in behalf of her client. *See Solway Decorating Co. v. Merando, Inc.*, 240 A.2d 361, 362 (D.C.1968).

In sum, Hopkins assumed no contractual obligations to Akins, Sr. or his attorney, and thus neither she nor her law partner are liable for breach of contract.[9]

7. "[T]he reasonable person [is presumed to] know[ ] all the circumstances surrounding the making of the contract" and "is bound by all usages which either party knows or has reason to know." *Dodek*, 537 A.2d at 1093 (citation omitted).

8. *Hudson v. Ashley*, 411 A.2d 963, 970 (D.C. 1980).

9. Although Hopkins cannot be sued for breach of a promise to safeguard the estate's assets, she did have capacity to act as a surety for the personal representative. The agreement, however, made no mention of a promise by Hopkins to answer

### III.

Akins, Sr. further argues, and the trial judge concluded, that even if Hopkins owed no contractual duty to him, Hopkins breached a duty to the beneficiaries to take reasonable steps to prevent Akins, Jr. from diverting estate assets. Appellee has not claimed that Hopkins counselled Akins, Jr. to act unlawfully, nor would the record support such a finding. The claim instead is one of legal malpractice. Whether a beneficiary of an estate may sue the attorney of the personal representative for negligence is an issue this court has not had occasion to decide. We now join the broad majority of the courts considering the question and hold, as a matter of law, that no such duty exists.

It is generally held that, "[i]n the absence of an express undertaking, fraud or malice, the attorney for a personal representative owes no duty to and cannot be liable for negligence to heirs, legatees, [or] creditors of the estate or [be] surcharged by the probate judge." RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE, § 26.10, at 618 (3d ed. 1989). Consistent with the fact, noted above, that our probate statute views "counsel for the estate . . . as an employee of the personal representative," *Poe*, 525 A.2d at 193, Mallen and Smith point out that:

> [While s]ometimes a lawyer is described as being the "attorney for the estate[," a]n early California Supreme Court decision explained why the description is inaccurate:
>
> > When an attorney is employed to render services in procuring admission of a will to probate or in settling the estate, he acts as attorney of the executor, and not the estate, and for his services the executor is personally responsible.

MALLEN & SMITH, § 26.4, at 600 (citation omitted).[10] The principal reason for this rule

is "the potentially adversarial relationship [that exists] between an executor's interest in administering the estate and the interests of the beneficiaries of the estate," *Rutkoski v. Hollis*, 235 Ill.App.3d 744, 175 Ill.Dec. 826, 831, 600 N.E.2d 1284, 1289 (1992):

> Typically in estate administration conflicting interests vie for recognition. The very purpose of the fiduciary is to serve the interests of the estate, not to promote the objectives of one group of legatees over the interests of conflicting claimants. . . . The fiduciary's attorney, as his legal adviser, is faced with the same task of disposition of conflicts. . . . While the fiduciary in the performance of this service may be exposed to the potential of malpractice (and hence is subject to surcharge when his administration is completed), the attorney by definition represents only one party: the fiduciary. It would be very dangerous to conclude that the attorney, through performance of his service to the administrator . . . , subjects himself to claims of negligence from the beneficiaries. The beneficiaries are entitled to even-handed and fair administration by the fiduciary. They are not owed a duty directly by the fiduciary's attorney.

*Goldberg v. Frye*, 217 Cal.App.3d 1258, 266 Cal.Rptr. 483, 489–90 (1990) (citations omitted).

Akins, Sr. presents essentially two arguments why this general rule ought not to apply to the present case. First, the rule is a sub-species of the general rule of privity "that the obligation of the attorney is to his client, and not to a third party. . . ." *Needham v. Hamilton*, 459 A.2d 1060, 1061 (D.C. 1983) (quoting *National Savings Bank v. Ward*, 100 U.S. 195, 200, 25 L.Ed. 621 (1880)). But, as Akins, Sr. points out, in *Needham* and other cases we have recog-

---

10. The principal reason for this rule for the debt of her client in the event he dissipated the estate's assets. *See* 72 C.J.S. *Principal and Surety* §§ 4, 29 (1987) ("Provided the nature, character, and extent of the obligation are described in certain and definite language, any language or expression is sufficient which, by general rules of construction, shows an intention to create the [surety] relationship", that is an undertaking "to pay the principal's debt . . . in case of default").

10. Contrary to the reasoning of the trial judge, this rule applies even though the attorney is to be paid from estate assets. MALLEN & SMITH, § 26.4, at 601; *Lasky, Haas, Cohler & Munter v. Superior Court*, 172 Cal.App.3d 264, 218 Cal.Rptr. 205, 217–18 (1985); *Clagett v. Dacy*, 47 Md.App. 23, 420 A.2d 1285, 1290 (1980).

nized—in keeping with the modern trend of decisions—an exception to the rule requiring privity. In *Needham* we cited *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), in which the court, through Judge Cardozo, "recognized that the law does impose a duty to exercise reasonable care which extends to third parties notwithstanding a lack of privity where the impact upon the third party is 'not an indirect or collateral consequence,' but the 'end and aim of the transaction.'" *Needham,* 459 A.2d at 1062 (citation omitted). The exception applies, in other words, "where it is alleged that the plaintiffs were *the direct and intended* beneficiaries of the contracted for services." *Id.* (emphasis added).

Akins, Sr. contends that as the sole legal beneficiary of the estate besides the son he fits this description. In *Needham,* however, we applied the exception to a markedly different situation than the one here. An attorney had been retained by the testatrix to draft a will naming a particular person as sole residuary beneficiary. He failed to do so and was later sued for negligence. In sustaining the cause of action, we pointed out that a principal policy underlying the general requirement of privity—allowing the parties to the attorney-client contract to maintain "control of their own agreement," *id.* at 1061 (citation omitted)—was not implicated in that case, because "the interests of the testatrix and the intended beneficiary with regard to the proper drafting and execution of the will are the same." That is, the intended beneficiary of the will was also the "direct and intended beneficiar[y] of the contracted for services." *Id.* As in *Needham,* nearly every case we have found in the probate context extending a duty of the attorney to parties beyond those with whom she is in privity has involved negligently drafted or executed wills,[11] reflecting a position of the testator vis-a-vis beneficiaries quite unlike the adversarial stance in which the personal representative commonly finds himself.

Again emphasizing the narrow class of beneficiaries here, Akins, Sr. points out that another concern underlying the privity rule is absent: avoiding exposure of the attorney

"to a liability in an indeterminate amount . . . to an indeterminate class." *Needham,* 459 A.2d at 1062 (quoting *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931)). But a principled exception to the privity requirement cannot be fashioned on the basis of the number of beneficiaries the estate turns out to have (or reasonably can be "foreseen" to have). And the number and nature of conflicting claims that can arise even among a small class of beneficiaries is something an attorney can scarcely anticipate. Implicit in the concern underlying the privity concept that attorney and client be able to "control . . . their own agreement," *id.* at 1061, is an attorney's difficulty in perceiving "the consequences of a duty to a third person [so that these] can be considered and declined if the conflicts or financial exposure is too great." MALLEN & SMITH, § 7.11, at 387.

Furthermore, any significance in the fact that Hopkins would be answerable to only a discrete number of beneficiaries (two) is neutralized by the hostile relationship that developed between father and son over the estate. Soon after Akins, Jr. retained Hopkins and was appointed personal representative, his father retained his own attorney and challenged in court both the son's appointment and the son's right to inherit from the estate. The father claimed that Akins, Jr. had never been adopted by the mother (a claim eventually resolved in the son's favor). "The [third party] beneficiary test simply does not apply in an adversary context. With unanimity, the courts have rejected all urgings to find a duty to the client's adversary in litigation." MALLEN & SMITH, § 7.11, at 386; *see also Morowitz v. Marvel,* 423 A.2d 196, 199 (D.C. 1980). The adversarial relationship was further highlighted as father and son (through their respective attorneys) negotiated an arm's length waiver of the bond requirement in return for Akins, Jr.'s promise to accept joint control over the proceeds of the sale.

Appellee's second principal argument is that, while the privity requirement may be soundly applied to the customary situation where the personal representative (aided by

---

11. *See, e.g.,* MALLEN & SMITH, § 7.11, at 387 ("Recent Florida decisions suggest that privity will

not be extended beyond the will drafting situation").

counsel) referees, as it were, between the interests of competing claimants to the estate, *see Goldberg v. Frye, supra*, it should not serve to insulate attorneys such as Hopkins from the consequences of negligently allowing the personal representative to divert estate property to his own use. The privity requirement, it is argued, should run no further than its purpose of protecting the attorney whose client, in the very process of disinterestedly serving the estate, may expose the attorney to unethical conflicts. When the client is mulcting the estate, on the other hand, the attorney's ethical duties may be quite different—including the obligation to rectify the illegal or fraudulent conduct or withdraw from the representation, *see In re Austern*, 524 A.2d 680 (D.C.1987)—and so she is properly answerable to injured beneficiaries for negligence.

We are unpersuaded by this distinction. One need only consider the frequency with which a personal representative is also a potential taker under the estate (or kin to a beneficiary), *see* D.C.Code § 20–303(a)(1), to see how impractical it is. With little imagination (and subject only to the demands of ethical pleading), claims of breach of fiduciary duty by the executor can routinely be cast in terms of the latter's asserted pursuit of his own interests at the expense of the estate, exposing the attorney in all such cases to joinder for negligently failing to monitor and intervene. Of course, where the attorney is alleged to be an accomplice in the wrongdoing, a different case is presented; "[i]ntentional wrongs ... can give rise to liability." MALLEN & SMITH, § 26.10, at 618; *Carrocia v. Carrocia*, 21 Ohio App.3d 244, 486 N.E.2d 1263, 1266 (1985) (complaint sufficiently alleged "malice or bad faith" on attorneys' part); *Anderson v. McBurney*, 160 Wis.2d 866, 467 N.W.2d 158, 161 (1991) (alleged misrepresentation by attorney to probate court about existence of heir). But no such allegations are made here. Absent a claim of intentional wrong by the attorney, the distinction appellee posits between the fiduciary-client who merely mismanages the estate and one who deliberately betrays his trust

affords no basis for making the attorney liable to beneficiaries.

*Reversed.*