In re ESTATE OF Ruth F. BERNSTEIN; David M. Albert, Appellant.

Nos. 08–PR–1294, 08–PR–1400, 09–PR–530.

District of Columbia Court of Appeals.

Argued May 25, 2010.

Decided Sept. 2, 2010.

Katherine M. Wiedmann, with whom Christopher G. Hoge, Washington, DC, was on the brief, for the appellant/cross-appellee David Albert.

Daniel S. Koch, with whom Glenn M. Cooper, Bethesda, MD, was on the brief, for the appellees/cross-appellants Bruce D. Burtoff, M.D. and Susan S. Burtoff.

Before WASHINGTON, Chief Judge, FISHER, Associate Judge, and PRYOR, Senior Judge.

WASHINGTON, Chief Judge:

This case comes to us after almost ten years of legal wrangling primarily surrounding the question of whether David M. Albert and his counsel were properly denied compensation for litigation expenses arising from Mr. Albert's efforts to administer the estate of Ruth F. Bernstein. For the reasons articulated below, we find that Mr. Albert is entitled to remuneration for the estate litigation expenses because he pursued the litigation in good faith and with just cause as required under D.C.Code § 20–752 (2001). Accordingly, we reverse the trial court's order requiring Mr. Albert to reimburse the estate for the legal fees he incurred in the course of the litigation and remand the case for the recalculation, consistent with this opinion, of the amount of compensation owed to Mr. Albert.

## I.

Bernstein died on January 8, 1999. She bequeathed her home to her nephew, Dr. Bruce D. Burtoff and his then-wife, Susan S. Burtoff ("Mrs. Burtoff"), and made specific bequests to several charities. She also left $1 million to be kept in trust (the "Trust") for the Burtoffs' children and designated Dr. Burtoff and Mrs. Burtoff as trustee and successor trustee. Dr. Burtoff also received all tangible personal property and Mrs. Burtoff was left the residue of the estate. Mr. Albert was designated in the will as personal representative of the estate, and he assumed that role in an unsupervised capacity on March 2, 1999.

Shortly after beginning his inventory of the estate, Mr. Albert became aware that approximately $4 million had been transferred out of Bernstein's accounts in the three years leading up to her death; approximately $1.7 million in several *inter vivos* transfers to Dr. Burtoff's accounts, and approximately $2.3 million transferred three weeks prior to her death as part of an annuity agreement (the "Annuity") with RB Investments, a limited liability company created by Dr. Burtoff for that purpose. The circumstances surrounding these transfers suggested to Mr. Albert that Bernstein, who was suffering from senile dementia and Alzheimer's disease before her death, had been taken advantage of by Dr. Burtoff. For example, Bernstein received a single prorated quarterly payment pursuant to the Annuity agreement, before dying, in the amount of $12,273 on December 31, 1998. Indeed, Mrs. Burtoff wrote Mr. Albert a letter on March 23,

1999, through her counsel, claiming that the signature of her name on the Annuity agreement was a forgery, that Bernstein was mentally and physically incapable of consenting to the transaction, and because the transaction depleted her residual interest in the estate, urging Mr. Albert to recover the Annuity principal for the estate. Also, Dr. Burtoff did not pay taxes on or disclose these transfers, which he avers were gifts or, in the case of the Annuity, a valid transaction, to the Internal Revenue Service. As a consequence of both the approximately $4 million depletion in assets and the potential tax liability to the estate of the unpaid taxes, Mr. Albert concluded that the estate lacked sufficient assets to fund the specific bequests in the will, and the Trust in particular.

Accordingly, on August 31, 1999, Mr. Albert filed suit to recover for the estate the monies transferred by and to Dr. Burtoff before Bernstein's death. In this effort, he was initially encouraged by Mrs. Burtoff because her marriage to Dr. Burtoff had collapsed around mid–1998, and the *inter vivos* transfers depleted the residuary estate to which she was entitled. Dr. Burtoff vigorously fought Mr. Albert's efforts through multiple objections and motions, counter-suits, and general uncooperativeness. There were settlement negotiations that failed to result in a settlement.[1] Ultimately, Mr. Albert voluntarily dismissed the suit, a move which was also aggressively opposed by Dr. Burtoff because he did not want Mr. Albert to be able to refile the suit. In approximately mid–2001, however, the Burtoffs reached a divorce settlement which apparently provided for Mrs. Burtoff's withdrawal of her support for Mr. Albert's litigation against Dr. Burtoff. This was made known to Mr. Albert in a letter dated August 22, 2001, in which both Burtoffs asked Mr. Albert to cease his pursuit of the $4 million transferred by Dr. Burtoff on the ground that they were the only interested parties under the will, and therefore, Mr. Albert's only duty was owed to them, not the Burtoff children. Subsequently, on December 14, 2001, Mr. Albert refiled his suit against Dr. Burtoff to recover the Annuity premium for the estate because he believed that he was obligated to fully fund the Trust irrespective of Dr. Burtoff's instructions as trustee to the contrary. The parties agreed to stay that action pending a decision from this court in a related matter.

■ On December 18, 2001, Mr. Albert filed a Petition for Aid and Direction ("Aid Petition") pursuant to D.C.Code § 20–742 that outlined the conflict of interest between Dr. Burtoff, who naturally opposed Mr. Albert's efforts to recover from him, and the Burtoff children, whose Trust would apparently not be fundable absent that recovery. The Aid Petition requested unspecified direction from the court as to whether the litigation should be pursued, and specifically called for the appointment of a guardian *ad litem* to protect the Burtoff children's interests. The court nominally denied the Aid Petition, but did recognize the potential conflict of interest between Dr. Burtoff and his children's interests and appointed a guardian *ad litem* on January 28, 2002. The guardian's March 18, 2002 report found that the children were in need of a guardian *ad litem* and stated that "[i]t is in the best interest of the minor children for the $1

---

1. Dr. Burtoff contends that in 1999 he offered to settle all outstanding debts and issues related to the estate administration, and that Mr. Albert rejected the settlement offer in bad faith. Our review of the record, however, and specifically the exchange of letters between Mr. Albert and Dr. Burtoff in July and August of 1999, makes clear that Mr. Albert pursued ongoing negotiations. Those negotiations were unsuccessful.

million [Trust] to be funded ...; therefore, any good faith efforts to retrieve sufficient funds to establish the [Trust] should be pursued...." Dr. Burtoff vehemently opposed appointment of the guardian *ad litem,* and filed a civil suit against Mr. Albert as well as various motions to have Mr. Albert and the guardian *ad litem* removed from their respective positions. On July 8, 2002, Mr. Albert resubmitted the Aid Petition, which the trial court denied on September 10, 2002 while noting that D.C.Code § 20–742 must be read as "granting the personal representative permission to act in matters where there is not a specific grant of authority, or in matters where there may be an ambiguity," but that any further direction from the court would constitute the impermissible giving of legal advice. The trial court then held that its dismissal of the Aid Petition necessitated dismissal of the guardian *ad litem,* and as an aside, that the Burtoff children's only interest—and therefore, their standing—in the proceedings was generated by the civil litigation concerning the "financial transactions that took place prior to the creation of the estate" and consequently did not arise under the probate code.[2] Following the trial court's dismissal of the Aid Petition in September 2002, Mr. Albert did not initiate any further litigation. On September 13, 2004, the trial court ordered Mr. Albert to disburse and then close the estate,

funding the Trust by conveying to it the claims against Dr. Burtoff. No appeal was taken from this order, and the closing of the estate rendered moot Mr. Albert's parallel litigation to recover the Annuity premium for the estate.

On December 6, 2004, Mr. Albert filed a request for $809,040.31 in compensation for his services as personal representative and his own and his counsel's litigation expenses. Dr. Burtoff again mounted a vigorous opposition, arguing that Mr. Albert breached his fiduciary duty of care in myriad ways, had already paid himself the full amount of compensation requested, and should refund the full amount to the estate with interest. The trial court, in an order issued on July 19, 2007, held that Mr. Albert had not breached his fiduciary duty of care and awarded him compensation for estate administration services, subject to a few deductions. With respect to compensation for litigation expenses, however, the trial court first cited *Hopkins v. Akins,* 637 A.2d 424 (D.C.1993), for the proposition that a personal representative may not "promote the objectives of one group of legatees over the interest of conflicting claimants," and then cited *In re Estate of Wilmotte,* No. 294–00 (D.C.Super.Ct. May 16, 2002) (López, J.), as holding that "a personal representative may not deplete estate resources to pursue benefits solely on behalf of the residuary lega-

---

**2.** Though it is not pertinent for our purposes, it should be noted that the trial court erred in separating the civil litigation from the estate proceedings. A personal representative acts as if in the legal shoes of the decedent, *see* D.C.Code § 20–701(c) ("Except as to proceedings which do not survive the death of the decedent, a personal representative of a decedent ... has the same standing to sue and be sued ... as the decedent had immediately prior to death."), and in that capacity "has a duty to ... maintain any action reasonably necessary—including, presumably, an action against a trustee ...—to recover possession of

estate property." *Rearden v. Riggs Nat'l Bank of Washington, D.C.,* 677 A.2d 1032, 1038 (D.C.1996) (citing D.C.Code § 20–702). Therefore, when a personal representative undertakes to pursue a civil claim on behalf of the estate, he acts under his express authority—indeed, obligation—under the probate code. *See* D.C.Code § 20–702. Of course, the prudence of that undertaking is a separate issue intertwined with the parameters of the personal representative's fiduciary duty, but whether or not advisable, such a civil suit cannot be considered apart from the estate administration in such circumstances.

tees to the detriment of the specific legatees."[3] The trial court then concluded that "[e]ven though [Mr. Albert] might have in good faith held a general belief that the Estate was unlikely to satisfy all general bequests and has now provided a reasonable accounting supporting that belief, . . . [he] has not shown the Court that he had any reasonable understanding of the Estate's capability from its inception to fund the general legacies and financially support the litigations: Therefore, this fully justifies the Court in concluding that the costs or compensation related to the lawsuits may only be provided from whatever funds would fall to the residuary estate at the time of Mrs. Bernstein's death." And, as Mr. Albert had testified that there were no funds in the residuary estate, "even if the Court were to find good faith and just cause for pursuing the trust action, the Estate had nothing to pay Mr. Albert's litigation expenses. . . . Accordingly, Mr. Albert must . . . bear the burden of funding the fees and costs associated therewith." The trial court granted attorney's fees to Mr. Albert's counsel, to be paid by Mr. Albert and not the estate, and also ordered that Mr. Albert refund the $503,101.17 difference between the compensation awarded and the $935,725.01 it found he had already disbursed from the estate to himself.[4] Prejudgment interest on that amount was denied. Both sides appealed.[5]

## II.

Mr. Albert argues that the trial court erred as a matter of law and as a matter of fact in concluding that he failed to ascertain the financial wherewithal of the estate prior to initiating litigation to recover the funds transferred to Dr. Burtoff, and was, therefore, as a remedial measure, limited to seeking compensation for litigation expenses from the funds in the residual estate. We review the trial court's conclusions of law *de novo*, but the reasonableness of a trial court's award of compensation is reviewed for abuse of discretion. *In re Estate of Murrell*, 878 A.2d 462, 464 (D.C.2005). "[F]ailure to make appropriate findings of fact is itself an abuse of discretion." *In re Estate of King*, 769 A.2d 771, 777 (D.C.2001) (quoting *Williams v. Ray*, 563 A.2d 1077, 1080 (D.C.1989)).

A personal representative's remuneration for litigation pursued on behalf of an estate is governed by D.C.Code § 20–752, which provides that "when a personal representative . . . defends or

---

3. The quotations are from the trial court's order, and not the cases cited.

4. Mr. Albert contends that he was never paid a portion of the funds the trial court ordered him to refund to the estate, and we see no evidence in the record that supports the trial court's findings in this regard. We therefore remand this matter for a full determination of what Mr. Albert actually disbursed from the estate and a recalculation of compensation thereupon.

5. Appellees, as Cross–Appellants, argue that the trial court abused its discretion (1) in granting compensation to James J. Faris, counsel for the estate, because he had a conflict of interest; (2) in failing to conclude that Albert's expenses in defending his right to compensation were excessive; and (3) in denying their request for prejudgment interest to be assessed on the funds the trial court ordered Albert to refund to the estate. We find no support in the record that would suggest the trial court abused its discretion in awarding attorney's fees to Mr. Faris, or in denying prejudgment interest, and accordingly affirm the trial court's judgment as to those issues. To the extent that the trial court's conclusion that Mr. Albert's requested compensation was reasonable is not undermined by this opinion's instructions to recalculate the compensation owed, we also hold that the trial court did not abuse its discretion in so concluding.

prosecutes in good faith and with just cause any proceeding relating to the decedent's estate, whether successful or not, such personal representative shall be entitled to receive from the estate any necessary expenses and disbursements relating to such proceeding." There is no separate, "prudential" standard of care within the statute that must be satisfied before a personal representative can be compensated for litigation pursued in good faith and with just cause.[6] Similarly, nothing in D.C.Code § 20–752 or other relevant statutes provide for the partitioning of an estate with respect to the

*source* of funds from which to pay a personal representative for litigation expenses to which he is "entitled" if he acted in "good faith and with just cause" in pursuing and continuing the litigation. Thus, the only appropriate inquiry precedent to awarding payment to a personal representative of necessary litigation fees and expenses is whether in fact the litigation was commenced and continued in good faith and with just cause,[7] *see* D.C.Code § 20–752; *and see, e.g., King, supra,* 769 A.2d at 780 (remanding for a finding of whether personal representatives pursued litigation in good faith and

6. The District's probate code provides for four different standards of care or types of obligations that a personal representative must satisfy, two of which are generally applicable to the administration of the estate and two of which are specific to the commencement of litigation on behalf of the estate: First, D.C.Codes §§ 20–701 and –743 establish that a personal representative is a fiduciary who owes a consequently elevated duty of care to interested persons, to whom the personal representative is directly liable if he breaches that fiduciary duty of care. The fiduciary standard of care encompasses the requirement of prudence explicitly; D.C.Code § 20–701(a) provides that "[a] personal representative . . . is a fiduciary who, in addition to the specific duties expressed in this title, is under a general duty to settle and distribute the estate of the decedent in accordance with the terms of the will . . ., as expeditiously and efficiently as is prudent and consistent with the best interests of the persons interested in the estate." This language of D.C.Code § 20–701(a) references the second category of obligation to be satisfied by a personal representative, the "addition[al] . . . specific duties expressed in this title," which can be described as statutory obligations and are distinct from the general fiduciary duty. These include, for example, the requirement in D.C.Code § 20–711 that "a personal representative shall, within 3 months of appointment, prepare a verified inventory of property owned by the decedent at the time of his death." *See also* D.C.Code § 20–713.01 (mandating the inventory and appraisal duties of an unsupervised personal representative). The two standards

of care that are specific to litigation commenced on behalf of the estate and in accordance with which a personal representative must operate are those provided in D.C.Code § 20–752: good faith and just cause.

7. Of course, after determining that litigation was pursued in good faith and with just cause, a trial court must then examine whether the expenses incurred thereby were "necessary." D.C.Code § 20–752; *and see Duggan v. Keto,* 554 A.2d 1126, 1142 (D.C.1989) (remanding for an explanation of how the trial court determined that the attorney's fees awarded were appropriate). Breach of a fiduciary or statutory duty by the personal representative may also result in sanctions that offset any compensation to which the personal representative is entitled. *See* D.C.Code § 20–743; *and see, e.g., King, supra,* 769 A.2d at 781. However, the obligations incumbent upon a personal representative as a fiduciary, though related to and frequently overlapping with notions of good faith and just cause, are distinct therefrom, and D.C.Code § 20–752 unambiguously provides that compensation to a personal representative for litigation expenses incurred while pursuing an estate's claims is contingent only upon a finding of good faith and just cause. *Compare* D.C.Code § 20–752 (entitlement of personal representative to compensation for necessary litigation expenses incurred in good faith and with just cause), *with* D.C.Code § 20–743 (liability of personal representative to interested persons for breach of fiduciary duty). The trial court expressly found in this case that Mr. Albert did not breach his fiduciary standard of care.

with just cause), and upon a finding that it was, compensation should be paid from the undivided estate.

■ Here, in its July 19, 2007 order, rather than making a positive finding that Mr. Albert had pursued the estate litigation in good faith and with just cause, the trial court stated that it "ha[d] not concluded that the personal representative litigated not in good faith or without just cause...." It did note that "had the personal representative succeeded with the litigation, the estate clearly could [have] benefit[ted] from it." It also acknowledged that "[o]ne of the most important factors is what Mr. Albert knew at the time he made certain crucial decisions." The trial court's findings regarding what Mr. Albert knew were:

> Among the things that Mr. Albert has revealed was his belief of the Estate's financial status at the time of Mrs. Bernstein's death. And there was his understanding that more than two million dollars were diverted out of Mrs. Bernstein's estate within a month of her death to a company owned and operated by Dr. Burtoff, who otherwise would have received simply one half interest in a piece of real property according to Mrs. Bernstein's Last Will and Testament. This fund transfer was precipitated by Dr. Burtoff's request that attorneys Albert and Faris meet with Mrs. Bernstein to change her will. Twice, the attorneys concluded that Mrs. Bernstein was not testamentary competent. In addition, there were the medical notes from Georgetown University Medical Center around the same time indicating Mrs. Bernstein as suffering from senile dementia and Alzheimer's. In addition, there was the letter dated March 23, 1999 from Susan Burtoff's counsel alleging that Mrs. Bernstein was mentally and physically incapacitated on December 16, 1998, the day she signed the Agreement. The letter also stated that Mrs. Burtoff denied ever signing a certain release document that Dr. Burtoff supposedly obtained from her and Mrs. Bernstein. Mr. Albert had further uncovered evidence of Dr. Burtoff using Mrs. Bernstein's funds to pay his personal debts, which could be either Dr. Burtoff using his powers of attorney engaging in acts of self-dealing or Dr. Burtoff receiving gifts from Mrs. Bernstein that should have been reported to the IRS.

Compounding the panorama of the situation is the suspicion or misunderstanding expressed by Mr. Albert about the signature on the [Annuity] Agreement and the resistance or refusal by Dr. Burtoff to divulge information or clarify the issues. This would support Mr. Albert's inference that Dr. Burtoff was hiding something, and that Mrs. Bernstein most likely did not sign the [Annuity] Agreement on December 16, 1998. By extension, it would also seem reasonable that Mr. Albert had a basis to believe that Mrs. Bernstein did not authorize the various other *inter vivos* transfers.

Having considered the totality of the circumstances that transpired prior to the commencement of the Trust lawsuit, there would seem to have been sufficient evidence to support a finding that Mr. Albert acted in good faith and with just cause to pursue a sizable recovery for the Estate that in turn would allow, according to Mr. Albert's belief, the Estate to make all bequests that Mrs. Bernstein wished to make, including funding of the [Trust] and providing some residual benefit to Mrs. Burtoff. Furthermore, the trial court noted that after it issued its September 13, 2004 order, which "effectuated the closing of the estate," "Mr. Albert subsequently dismissed the civil lawsuit ... and duly com-

pleted the final estate administration as ordered by the Court."

However, despite the fact that the trial court found that the litigation would clearly have benefitted the estate had it been successful, it also found that Mr. Albert had failed to "analyz[e] the ability of the Estate to fund a costly litigation[, which] is a crucial factor to the wisdom and the extent of undertaking such an action, and how far to maintain it." Further, the trial court concluded that because "Mr. Albert has not shown the [trial court] that he had any reasonable understanding of the Estate's capability from its inception to fund the general legacies and financially support the litigations ... [the trial court is] fully justifie[d] ... in concluding that the costs or compensation related to the lawsuits may only be provided from whatever funds would fall to the residuary estate at the time of Mrs. Bernstein's death." In sum, the trial court held that, irrespective of the estate's actual ability to satisfy the bequests in Bernstein's will or its ability to fund the litigation, it was imprudent for Mr. Albert to pursue the litigation without making a "formal determination" of that ability in advance, and this imprudence justified restriction of any compensation to the residue of the estate. None of the authority cited by the trial court supports its conclusion that Mr. Albert could only be compensated from the residuary estate,[8] and it reached this conclusion without finding that Mr. Albert pursued the litigation solely for the benefit of the residuary legatee, Mrs. Burtoff.

We read the trial court's order, notwithstanding its claim to the contrary, as finding that Mr. Albert acted in good faith and with just cause, a finding which we believe is fully supported by the record.[9] Mr. Albert commenced his administration of the Bernstein estate by preparing and delivering to the parties a timely preliminary accounting in 1999, to which none of the interested parties took exception. Under D.C.Code § 20–713.01, which applies to unsupervised estate administrations, he

8. The trial court cited to *Hopkins, supra,* and *Wilmotte, supra,* apparently as permitting it to restrict compensation under D.C.Code § 20–752 to the residuary estate. It misreads both cases. In *Hopkins, supra,* we held that the "purpose of the fiduciary is to serve the interests of the estate, not to promote the objectives of one group of legatees over the interests of conflicting claimants." 637 A.2d at 428. However, nothing in that opinion condones partitioning an estate for compensation purposes, even assuming that the facts supported awarding a personal representative only partial compensation. In *Wilmotte, supra,* a trial court memorandum opinion authored by the trial judge in this case, we likewise find nothing that stands for the proposition that compensation can be restricted to a portion of the estate. No. 294–00. Even assuming that the *Wilmotte* decision could be read to support such an interpretation, it is factually distinguishable from the present case. The trial court in that case specifically found that the litigation was pursued for the exclusive benefit of the residuary legatee, to the detriment of the other legatees. *Id.* at 1.

As noted, *supra,* no such finding was made in this case, and the record does not support such a finding because Mr. Albert's impetus in bringing the litigation was his concern that he would otherwise be unable to fund the specific bequests.

9. To the extent that Dr. Burtoff's argument that Mr. Albert pursued the litigation in bad faith relies on Mr. Albert having rejected Dr. Burtoff's July 1999 settlement offer, we note that the settlement offer was not actually rejected. In a letter dated August 3, 1999, Mr. Albert noted that he was not rejecting the offer, but could not agree to some of the terms because of the ongoing divorce proceedings involving Dr. and Mrs. Burtoff, and without knowing what the tax liability would be from the Internal Revenue Service audit. In light of what he believed to be his obligations as the estate's personal representative, including his perceived fiduciary duty to the Burtoff children, Mr. Albert's refusal to accept Dr. Burtoff's settlement offer in its entirety in August 1999 could not be considered unreasonable or in bad faith.

was under no obligation to file the accounting with the court. In preparing this threshold accounting, Mr. Albert became aware that substantial assets had been transferred by Dr. Burtoff from Bernstein's accounts to Dr. Burtoff's personal accounts over the several years immediately preceding her death, and that there had been a sizeable annuity transaction that removed substantial assets from the estate at a time when there was some evidence Bernstein was incapable of consenting to such a transaction. Mr. Albert concluded that the transfers of monies and their potential tax consequences for the estate so depleted the estate that Mr. Albert could not fund the specific bequests in the will, and specifically the bequest to the Burtoff children. Mrs. Burtoff also expressed concern about her legacy by writing a letter, through her counsel, urging Mr. Albert to recover the $2.3 million Annuity premium from Dr. Burtoff because that transaction depleted the residuary estate to which she was entitled. Unclear as to whom he owed a duty of care, an issue brought to the forefront by conflicting instructions from Dr. Burtoff and Mrs. Burtoff, coupled with a concern that the Burtoff children's interests be protected, Mr. Albert sought advice from the trial court on how to proceed and asked specifically for the appointment of a guardian *ad litem* for the children. At that time, the trial court agreed with Mr. Albert that there was a likely conflict of interest with respect to the administration of the estate between Dr. Burtoff as trustee and his children as beneficiaries under the Trust. Accordingly, it appointed a guardian *ad litem* to protect the children's interests. Thus, it appears that the trial court viewed the actions of Mr. Albert in raising this potential conflict to the attention of the court as having been taken in good faith and with just cause, at least up to that point. Subsequently, the guardian *ad litem* issued a report to the trial court and interested parties that indicated its agreement with Mr. Albert that there was a conflict of interest and that the children's interests were not being protected by Dr. Burtoff. As an interested party, *see* D.C.Code § 20–101 (defining "[i]nterested person" to include a guardian *ad litem*), the guardian *ad litem* had standing to raise this issue, independently of Mr. Albert. Thus, even though by the date of the guardian *ad litem's* report in early 2002, Mrs. Burtoff had already withdrawn her support for any challenge by Mr. Albert to Dr. Burtoff's activities with respect to the estate, the report itself, especially in the absence of any specific direction by the trial court to the contrary, convinces, as a matter of law, us that Mr. Albert was not on a lark but rather was pursuing the litigation against Dr. Burtoff in good faith and with just cause.

Notwithstanding the guardian *ad litem's* report, however, the trial court ultimately resolved the ethical issue in the case by issuing an order, dated September 10, 2002, in which it answered no to the legal question whether the Burtoff children's interest in the proceedings arose under the estate administration such that Mr. Albert would owe them a fiduciary duty of care. For purposes of our analysis, even assuming that the trial court's conclusion was wrong,[10] Mr. Albert was clearly on notice at that point that continuing to litigate the issues regarding the removal of assets by Dr. Burtoff from the Bernstein estate was unwarranted. Therefore, while all prior litigation was pursued in good faith and with just cause, any subsequent litigation would not have been appropriate. We find, however, no evidence in the record

---

**10.** See footnote 2, *supra,* for our conclusion that the trial court was wrong as a matter of law that Mr. Albert's litigation to recover the Annuity premium did not arise under the purview of the administration of the estate.

that Mr. Albert continued with the estate litigation after the September 10, 2002 order. Instead, as the trial court itself noted, Mr. Albert heeded the order, ceased litigation over the Annuity and related claims, and has since then pursued only his just compensation for his efforts as personal representative and remuneration for litigation expenses.

Accordingly, and because the imposition of a prudential bar to compensation—*i.e.*, the "formal determination" of the estate's financial wherewithal that the trial court found lacking—that is separate and distinct from either fiduciary or statutory obligations improperly adds an additional element to D.C.Code § 20–752, we reverse the trial court's conclusion that Mr. Albert's compensation could be restricted to funds available in the residuary estate. Because the record supports no other conclusion but that Mr. Albert acted in good faith and with just cause, and because these are the only two statutory criteria to be considered under D.C.Code § 20–752 before granting compensation to a personal representative for litigation expenses,[11] we remand the case to the trial court to recalculate the compensation owed to Mr. Albert.

*So ordered.*

---

11. Of course, as discussed in footnotes 6–7, *supra*, a personal representative's compensation is also subject to his having breached his fiduciary duty of care or violated a statutory obligation, such as the duty to take a proper inventory of the estate. *See King, supra,* 769 A.2d at 778 (permitting monetary sanctions of the personal representative for taking "actions which provide no benefit, and indeed are detrimental, to the estate"). Here, however, the trial court held that Mr. Albert did not breach his fiduciary duty of care, and we agree. And its conclusion that Mr. Albert failed to reasonably ascertain the estate's financial state, a conclusion it reached without citing to any supporting evidence—and we see none to cite to—and without mentioning the contrary evidence in the record, cannot justify a monetary sanction without a finding that he did in fact fail to fulfill his statutory obligation to render an accounting. Thus, we perceive *no basis for looking past D.C.Code* § 20–752 in assessing whether and to what degree Mr. Albert is entitled to compensation for his litigation expenses.